UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BRIAN BALLENTINE, JEANCLAUDE LOMINY, LAUREN WOLF, and ISAAC ROTH, individually and on behalf of others similarly situated,

Plaintiffs,

-against-

UNDERDOG SPORTS, LLC d/b/a/ UNDERDOG FANTASY,

Defendant.

INDEX NO. 1:25-cv-01106

**COMPLAINT—CLASS ACTION**

**JURY DEMAND**

# TABLE OF CONTENTS

**Page**


NATURE OF THE ACTION ..... 1

PARTIES ..... 3

JURISDICTION AND VENUE ..... 5

FACTUAL ALLEGATIONS ..... 5

I. The Interactive Fantasy Sports Industry ..... 5

II. Underdog's online platforms provide unlawful sports betting camouflaged as fantasy games. ..... 8

III. Underdog is illegally operating sports betting without a sports betting license. ..... 11

IV. Defendant dupes consumers into thinking they are not gambling, while simultaneously luring them to gamble with matching and limited time bonus offers. ..... 13

V. Illegal gambling is addictive and dangerous, especially when consumers do not even know they are gambling. ..... 15

VI. States are Cracking Down on Unlawful Sports Betting ..... 16

CLASS ALLEGATIONS ..... 16

COUNT I N.Y. Gen. Oblig. Law § 5-419 Plaintiffs Against Underdog Sports, LLC d/b/a Underdog Fantasy ..... 19

COUNT II N.Y. Gen. Oblig. Law § 5-421 Plaintiffs Against Underdog Sports, LLC d/b/a Underdog Fantasy ..... 20

COUNT III N.Y. Gen. Bus. Law § 349 Plaintiffs Against Underdog Sports, LLC d/b/a Underdog Fantasy ..... 21

COUNT IV Unjust Enrichment Plaintiffs Against Underdog Sports, LLC d/b/a Underdog Fantasy ..... 22

PRAYER FOR RELIEF ..... 23

JURY DEMAND ..... 24

1. Plaintiffs Brian Ballentine, JeanClaude Lominy, Lauren Wolf, and Isaac Roth bring this case, individually and on behalf of all others similarly situated, against Underdog Sports, LLC d/b/a Underdog Fantasy ("Underdog") ("Defendant") to recover losses from Defendant's illegal sports gambling operation. Plaintiffs allege the following upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief, including investigations conducted by their attorneys, as to all other matters.

## NATURE OF THE ACTION

2. Defendant owns and operates an online and app-based platform that it falsely markets as an interactive fantasy sports game. In actuality, Defendant owns and operates an unlicensed sports betting platform. By operating unlicensed sports betting, Defendant has violated gambling laws, engaged in illegal deceptive activity, and unjustly enriched itself at the expense of tens of thousands of consumers. Accordingly, Plaintiffs on behalf of themselves and a Class of similarly situated individuals, bring this lawsuit to recover their losses, as well as costs and attorneys' fees.

3. Interactive fantasy sports games enable consumers to pick fantasy teams comprised of real-life athletes and compete against other consumers who have built different fantasy teams comprised of real-life athletes. The "winner" is determined based on the real-world performance of the real-life athletes on the fantasy teams.

4. In New York, interactive fantasy sports contests are legally different from sports betting. In sports betting, consumers gamble against a bookmaker ("the house") on performance statistics of athletes participating in a sporting event. The house sets betting lines, and consumers bet against the house. The house tends to be highly sophisticated, and aims to set accurate odds that give it the best chance of making money. The house also takes Vigorish ("the Vig"), which is

a fee charged for accepting a wager. In other words, sports books pay out less for a winning bet than they take for a losing bet. The Vig and the sophistication of house betting lines make it very difficult for consumers to make long-term profits from sports betting.[1]

5. As alleged herein, Defendant offered and offers (at all relevant times) "games" that are neither interactive nor fantasy. In fact, they are not games at all, but illegal sports betting. For example, Defendant provides a platform for consumers to place bets on how particular real-world athletes will perform against performance metrics set by Defendant. This is not *interactive*, because consumers are not playing against other consumers, but against the house (Defendant), which sets sophisticated betting lines in order to profit off of the consumers. It is not *fantasy*, either, because consumers are betting on the performance of particular athletes, rather than the performance of a group of athletes assembled on an imaginary team. It is sports betting, plain and simple.

6. Many state Attorneys General have come to similar conclusions. The Florida State Gaming Commission ordered Defendant to cease and desist offering "illegal bets" under the guise of fantasy sports.[2] Massachusetts, Arkansas, and other state gaming commissions have similarly concluded Defendant's fantasy games are illegal "sports wagering."[3]

7. Sports betting is illegal without a license, and Defendant at no point during the

---

[1] Jordan Anderson, *What is the Break Even Win % for Sports Betting?*, BettingPros (Jul 31, 2024), https://www.bettingpros.com/articles/what-is-the-break-even-win-for-sports-betting/

[2] Chase Howell, *Florida Sends Cease And Desist to PrizePicks, Underdog Fantasy and Betr,* Action (Feb. 15, 2024), https://www.actionnetwork.com/news/florida-sends-cease-and-desist-to-prizepicks-underdog-fantasy-and-betr.

[3] *See, e.g.*, Mike Mazzeo, *Massachusetts AG Cracks Down on Multiple Fantasy Sports Pick'Em Companies* (Feb. 27, 2023), https://www.legalsportsreport.com/168603/massachusetts-ag-cracks-down-on-multiple-fantasy-sports-pickem-companies/; Ciaran McLoughlin, *Underdog Sports and PrizePicks ordered to cease offerings in Arkansas* (Feb. 16, 2024), https://gamingamerica.com/news/9772/underdog-sports-and-prizepicks-ordered-to-cease-offerings-in-arkansas.

proposed Class period has had a sports betting license. Even if Defendant were operating interactive fantasy sports contests, Defendant would still need a license, and does not have one. Licenses allow the state to maintain gaming integrity, regulate who wagers money (including restricting minors and compulsive gamblers), and prevent unfair or misleading advertising. Without regulation, illegal sports books are able to mislead the public, including duping consumers into thinking they are not engaging in the highly addictive behavior of gambling when they are, creating betting lines with extremely poor odds of winning, misrepresenting consumers' chances of winning, and ultimately collecting money from consumers who do not realize the implications of their bets.

8. By operating unlicensed sports betting, Defendant has violated gambling laws, engaged in illegal deceptive activity, and unjustly enriched itself at the expense of tens of thousands of consumers. Accordingly, Plaintiffs on behalf of themselves and a Class of similarly situated individuals, bring this lawsuit to recover their losses, as well as costs and attorneys' fees.

## PARTIES

9. Brian Ballentine is a natural person and a citizen of the state of New York. He signed up through the Underdog Fantasy app in New York. Mr. Ballentine downloaded the Underdog App and placed bets through the App. Upon information and belief, he did not place bets on Underdog's website. Upon information and belief, he was never shown, nor did he ever accept, any version of Underdog's Terms of Service. Through the Underdog Fantasy app, he placed over 150 entries in Pick'em games. Mr. Ballentine was not informed by Underdog of the nature of its games – that it operates an unlicensed sports book. He also believed, based on Underdog's false and misleading representations on the app, that he had significantly better odds of payouts for correct picks.

10. JeanClaude Lominy is a natural person and a citizen of the state of New York. He

signed up through the Underdog Fantasy app in New York. Mr. Lominy downloaded the Underdog App and placed bets through the App. Upon information and belief, he did not place bets on Underdog's website. Upon information and belief, he was never shown, nor did he ever accept, any version of Underdog's Terms of Service. Through the Underdog Fantasy app, he placed numerous entries in Pick'em games. Mr. Lominy was not informed by Underdog of the nature of its games – that it operates an unlicensed sports book. He also believed, based on Underdog's false and misleading representations, that Underdog operated a regulated betting platform.

11. Lauren Wolf is a natural person and a citizen of the state of Texas. She signed up through the Underdog Fantasy app. Ms. Wolf downloaded the Underdog App and placed bets through the App. She did not place bets on Underdog's website. Upon information and belief, she was never shown, nor did she ever accept, any version of Underdog's Terms of Service. Through the Underdog Fantasy app, she places multiple entries in Pick'em games. Ms. Wolf was not informed by Underdog of the nature of its games – that it operates an unlicensed sports book. She also believed, based on Underdog's false and misleading representations on the app, that she had significantly better odds of payouts for correct picks.

12. Isaac Roth is a natural person and a citizen of the state of California. He signed up through the Underdog Fantasy app. Mr. Roth downloaded the Underdog App and placed bets through the App. He did not place bets on Underdog's website. Upon information and belief, he was never shown, nor did he ever accept, any version of Underdog's Terms of Service. Through the Underdog Fantasy app, he placed numerous entries in Pick'em games. Mr. Roth was not informed by Underdog of the nature of its games – that it operates an unlicensed sports book. He also believed, based on Underdog's false and misleading representations on the app, that he that

he would receive significantly larger payouts for correct picks.

13. Defendant Underdog Sports, LLC d/b/a Underdog Fantasy is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 150 Waterbury Street, Brooklyn, New York, 11206. Underdog conducts business throughout this District, New York State, and several states across the country including California and Texas. Upon information and belief, Underdog operates its business primarily through its headquarters in New York, processes payments in New York, and designates New York as the governing law in its terms of use. Underdog also states that its Copyright Agent is located at its principal place of business in Brooklyn, New York. Underdog's games are available to play online and its app, the Underdog Fantasy Sports App, can be downloaded on Android and Apple iOS devices.

## JURISDICTION AND VENUE

14. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

15. The Court has personal jurisdiction over Defendant because the wrongful conduct by Defendant occurred in and emanated from this District.

16. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

### I. The Interactive Fantasy Sports Industry

17. A fantasy sport is a game where participants assemble imaginary teams composed of real professional sports players. These imaginary teams "compete" based on the statistical

performance of those players in actual games. This performance is converted into points that are compiled and totaled according to a roster.[4]

18. Fantasy sports that were once casually played among families, friends, and colleagues at work have exploded in popularity with the rise of the internet. Companies began offering fantasy sports products on the internet beginning around the late 2000s, including on web pages and mobile platforms. Accordingly, consumers who used to play fantasy sports against family and friends can now also play them against strangers. In the 2010s, "daily" fantasy sports tournaments and contests gained popularity, where consumers pick fantasy teams of professional athletes over short-term periods such as a week or a single day, often under a fantasy salary cap. Daily fantasy sports contests are extremely lucrative for the companies that provide the service, while most consumers lose money.[5]

19. The growing popularity of daily fantasy sports began to catch the eye of the State of New York. In 2015, then-Attorney General of New York Eric Schneiderman moved to ban all forms fantasy sports operations in New York. One year later, then-Governor Andrew Cuomo signed into law new statutory provisions regulating the industry.[6] The statutory provisions authorizing and regulating daily fantasy sports in the State of New York can be found in Sections 1400-12 of the New York Racing and Pari-Mutuel Wagering & Breeding Law.

20. Section 1401(9) explains that "'[i]nteractive fantasy sports contest' or 'contest'

---

[4] Fantasy Sport, Wikipedia, https://en.wikipedia.org/wiki/Fantasy_sport (last visited Aug. 27, 2024).

[5] *See, e.g.*, Walt Bogdanich, Joe Drape & Jacqueline Williams, *Attorney General Tells DraftKings and FanDuel to Stop Taking Entries in New York*, N.Y. Times (Nov. 10, 2015), https://www.nytimes.com/2015/11/11/sports/football/draftkings-fanduel-new-york-attorney-general-tells-fantasy-sites-to-stop-taking-bets-in-new-york.html.

[6] Dustin Gouker, *Daily Fantasy Sports Is Back in Business in New York: Gov. Cuomo Signs Bill*, LegalSportsReport.com, https://www.legalsportsreport.com/10890/ny-enacts-dfs-law/ (last updated Aug. 3, 2016).

shall mean a ***game of skill*** wherein one or more contestants ***compete against each other*** by using their knowledge and understanding of athletic events and athletes to select and manage rosters of simulated players whose performance directly corresponds with the actual performance of human competitors on sports teams and in sports events." (emphasis added).

21. Per the statute, "[i]nteractive fantasy sports are not [illegal] games of chance because they consist of fantasy or simulation sports games or contests in which the fantasy or simulation sports teams are selected based upon the skill and knowledge of the participants [ …]." Section 1402(a).

22. In other words, interactive fantasy sports contests are predominantly games of skill because consumers use their knowledge of the sport to pick players to form well-balanced teams, and compete against other consumers who similarly use their own knowledge and skill.

23. Similarly, "[i]nteractive fantasy sports contests are not [illegal] wagers on future contingent events not under the contestants' control or influence because … the outcome depends on how the performances of participants' fantasy roster choices compare to the performance of others' roster choices." Section 1402(b).

24. In other words, interactive fantasy sports contests are not illegal wagers because the outcome depends on the overall skill of picking cohesive teams of athletes, compared to the performance of other rosters picked by opponents in the contest. This is distinct from betting against house lines set by gaming companies on individual athlete or team performances, or parlays combining multiple bets against the house.

25. Pursuant to Section 1402, any operator of an interactive fantasy sports contest in the State of New York must register with the New York Gaming Commission and be subject to the tax and regulatory decisions of that body. Furthermore, this activity may only take place

through platforms supplied by interactive fantasy sports operators that are regulated and overseen by the New York Gaming Commission. As described below, Defendant does not have an interactive fantasy sports license and provides games that are not interactive fantasy sports games. Instead, Defendant operates an illegal sports book.

## II. **<u>Underdog's online platforms provide unlawful sports betting camouflaged as fantasy games.</u>**

26. When signing up to play on Defendant's platforms, consumers are told that they are playing a fantasy game. For example, Underdog represents that it is a fantasy sports platform. For example, the name of Underdog's app on iPhone and Android is "Underdog Fantasy," and its web URL is "underdogfanstasy.com." The home screen contains the same graphic:

UNDERDOG FANTASY

27. It similarly described its "Pick'em" product as "Underdog Fantasy Pick'em."[7]

28. But this is not a "fantasy" platform. Defendant Underdog offered and offers games wherein consumers do not compete against other consumers in fantasy sports. Instead, it allowed and allows consumers to place bets or wagers against the house on athletes' performances that have nothing to do with other participants.

29. For example, Defendant provided and provides a platform wherein consumers can participate in "Pick'em" games. In Pick'em games, consumers place bets (or "wagers") on how athletes will perform on various metrics in professional sports games. The house lists a series of metrics available to be bet on such as points scored, rebounds, assists, or total yards. Then consumers "pick" the "over" or "under" for the respective categories.[8] The prediction is whether each player will exceed or miss a benchmark set by Underdog, such as whether a basketball player will score more or fewer than 25 points in a game.

30. Underdog's Pick'em games operate "like a traditional parlay" – consumers select "overs or unders for players in specific categories" in betting against the house.[9] In "Standard Pick'em Contests," all selections need to be correct in order to win.[10] Underdog also offered and offers insured contests, where consumers can "win" if only one of their picks beats the house, with upside increasing if more picks beat the house.

31. Underdog also offered and offers "Pick'em Champions." Underdog markets this product as "a fantasy contest in which participants create a roster of 2, 3, 4, or 5 athletes." For each athlete in the roster, participants choose their preferred statistical metric and use knowledge

---

[7] Rules, UnderdogFantasy.com, https://underdogfantasy.com/rules (last visited Aug. 27, 2024).
[8] Underdog sometimes calls these bets "higher" or "lower" instead of "over" or "under."
[9] *Guide to Fantasy Props on the Underdog Fantasy Platform*, Props, https://props.com/underdog-fantasy-pickem-strategy/ (last visited Aug. 27, 2024).
[10] *Id.*

and skill to predict whether the athlete will go higher or lower than a specific benchmark for that statistic. Winning depends on how all of the athletes in the roster perform based upon the participant's projection relative to other participants' projections for their entries. The more selections you get right relative to other participants, the more you are likely to win."[11] Underdog awards money to entrants based on its assessment of the "difficulty of [consumers] selections" according to "its own fantasy sport scoring criteria."[12] In other words, consumers do not know the prize prior to participating and Underdog sets the over/under metrics itself. Based on information and belief, Underdog keeps some of the entry fees, such that the "house" is a participant in the game.

32. Underdog's Pick'em products are unlicensed sports betting against the house, not interactive fantasy games played against other consumers. Accordingly, the product is "betting on athlete stats masquerading as fantasy sports."[13]

33. In this way, Defendant's Pick'em games violate Section 1400-12 in at least two ways.

34. *First*, Defendant's Pick'em games are illegal games of chance and not legal games of skill. As with any illegal gambling involving multiple human participants—like roulette, craps, or blackjack—winning the game involves getting lucky to beat the house. Consumers cannot rely on their skill and knowledge to gain a competitive edge over other players because they are not competing only against other players. Rather, they are competing against a multi-million dollar corporation that would fail if consumers were simply able to win based on skill and knowledge

---

[11] Pick'em Champion Rules, Underdog Fantasy, https://underdogfantasy.com/rules/pick-em-champions (last visited Aug. 27, 2024).
[12] *Id.*
[13] *Take Your Pick*, *supra* note 9, https://www.egr.global/northamerica/insight/take-your-pick-how-pickem-games-have-emerged-as-a-new-regulatory-battlefield-in-dfs/.

alone.

35. *Second*, Defendant's Pick'em games are illegal wagers on future contingent events. Because consumers do not pick a fantasy team that "competes" against other consumers, the outcome does not depend on the choices of other consumers. Rather, just as with any other wager, consumers in Pick'em contests are placing wagers on the likelihood of a future contingent event—*e.g.*, whether basketball player x scores y points in z game—over which the consumer has no control.

36. Thus, the Pick'em style games offered by Underdog are not interactive fantasy sports—they are illegal proposition sports betting.

## III. Underdog is illegally operating sports betting without a sports betting license.

37. Chapter 59 of the Laws of 2021 amended N.Y. Racing, Pari-Mutuel Wagering and Breeding Law section 1367 and added section 1367(a) to authorize mobile sports wagering to licensed companies. The statute directed the Gaming Commission to conduct a competitive bidding process to award licenses to not less than two mobile sports wagering platform providers that would host no less than four mobile sports wagering operators.

38. In December 2021, the Commission awarded licenses for ten years to nine mobile sports wagering operators at a tax rate of 51 percent. Defendant is not included among the nine operators.[14]

39. The taxes from these licenses fund the Council on Problem Gambling, which monitors gambling addiction on the platforms, operates seven problem gambling resource centers across the state, and hosts events, workshops, and conferences to raise awareness regarding the

[14] N.Y. State Gaming Comm'n & N.Y. State Office of Addiction Servs. & Supports, *Annual Report* 2-3 (Apr. 19, 2023, updated June 29, 2023), https://www.gaming.ny.gov/pdf/06.29.23.MSWImpactReport.pdf.

risks and signs associated with problem gambling, and provides referrals to help addicts access appropriate services.[15]

40. In addition to levying heavy taxes on licensed mobile sports wagering operators, the law requires operators to implement measures to prohibit minors from participating in sports wagering activity, and the Commission tracks alleged occasions of underage participation on the licensed platforms.[16] Additionally, and in recognition that gambling is an addictive and potentially dangerous behavior, New York State has developed a robust self-exclusion program for individuals "who recognize that they should no longer participate in legal gambling."[17]

41. Pursuant to that law, the Commission also collects data and demographic information from sports wagering participants on legal platforms and those seeking help for gambling addiction.[18] This information includes:

a. Statistics and demographics regarding the number of individuals who accept problem gambling information upon entering voluntary self-exclusion;

b. Statistics and demographics relating to page interactions for individuals who visit sports wagering licensees' problem gambling web pages;

c. Statistics and demographics of sports wagering participants who, upon annual notification of hitting the statutory deposit limit, opt to take a "break" or acknowledge the limit and continue play;

d. Gathering information about trends in gambling disorders;

e. Providing training specific to mobile sports betting for counselors

[15] *Id.* at 6.
[16] *Id.* at 4.
[17] *Id.*
[18] *Id.* at 6-7.

including training on engaging family members; and

f. Identifying specific geographic regions or vulnerable populations in need of services and developing programming to address those specific needs.

42. Defendant is operating a sports wagering enterprise in the State of New York without licenses. Thus, it is operating illegally, avoiding the robust taxes that New York levies on legally operating companies, and sidestepping the tightly-regulated environment that allows the state to monitor legalized gambling, identify problematic behavior, and act appropriately to ensure the legalized gambling experience is consistent with the values of the State of New York.

**IV. Defendant dupes consumers into thinking they are not gambling, while simultaneously luring them to gamble with matching and limited time bonus offers.**

43. Defendant's egregious violation of New York law goes further still. Under the guise of offering interactive fantasy games, Defendant lures consumers to gamble with special offers. As detailed below, Defendant enables addictive gambling behavior by underage adults, problem gamblers, and others by enticing them to gamble with "free" money while ensuring them that they are not actually gambling. This is akin to providing alcohol to minors and labeling it juice.

44. For example, consumers who are interested in participating in fantasy games on Underdog's mobile platform are provided the following screens. On multiple screens in the sign-up process, consumers are faced with offers that any amount deposited up to $100 will be "matched." In other words, consumers are enticed to join the platform because they will be receiving a match of funds.


Sign up
Username
0/24
Only numbers and letters, min 2 characters
Email
Enter a valid email address
Password
Min 8 characters, 1 number or 1 special (!,*,etc)
Date of birth
MM/DD/YYYY
Promo code or username
Enter a promo code or friend's username
Don't have one?
Sign up
Already have an account? Log in


Sign up
We'll match your first deposit up to $100!
What's your birthday?
Just gotta make sure you're 18+
[redacted]
Continue
Done
[redacted]


Deposit Match
We'll match your first deposit up to $100!
Deposit now


00:17:56
Get up to $1,000 in Bonus Cash!
$50 deposit + $25 bonus match
Total: $75
$50
Choose a payment method
+ $50
+ $100
+ $250
Verify identity to deposit
1
2 ABC
3 DEF
4 GHI
5 JKL
6 MNO
7 PQRS
8 TUV
9 WXYZ
0

45. At no point during the mobile sign-up process does Underdog alert consumers to terms and conditions, terms of service, or privacy policies.

46. At no point in the sign-up process does Underdog inform consumers that they will be betting against Underdog.

47. Thus, Underdog lures consumers onto "fantasy" platforms, offering to match their contributions or provide "free" money upon a consumer signing up.

## V. **Illegal gambling is addictive and dangerous, especially when consumers do not even know they are gambling.**

48. Research on gambling addiction has demonstrated the grave problems that arise for individuals participating in sports betting games, including addiction and suicidal ideation.[19]

49. By stimulating the brain's reward system, gambling can lead to addiction and cause participants to risk valuable assets—*e.g.* money—in hopes of getting something of even greater value.[20]

50. Furthermore, Pick'em games are especially popular with younger members of the sports betting community. The average age to play Pick'em games on Underdog's platform is 18.[21]

51. Thus, Pick'em games provided by Underdog make unlawful gambling widely available to the public through its online and mobile platforms, presenting broader swaths of the population with the attendant risks of gambling without any of the safeguards. The risk is particularly damaging because the average age of the population participating in these unlawful

[19] Lia Nower et al., *Daily Fantasy Sports Players: Gambling, Addiction, and Mental Health Problems*, J. Gambling Stud., Sept. 2018, at 727-37.
[20] Emily Sohn, *How gambling affects the brain and who is most vulnerable to addiction*, Monitor on Psych., July/August 2023, at 62, https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain.
[21] Terms of Use, UnderdogFantasy, at ¶ 3(i) (June 28, 2024) https://legal.underdogfantasy.com/?g=42203.

games skews younger.

## VI. States are Cracking Down on Unlawful Sports Betting.

52. States are beginning to crack down on these unlawful sports-betting operations. In addition to New York, Massachusetts, Arkansas, and Florida (*see* ¶¶ 5-6, *supra*), Maryland, West Virginia, and Wyoming gambling regulators last year told Underdog to stop operating in those states because it was offering sports wagering without a sports-betting license.[22]

53. Additionally, in October 2023, the New York Gaming Commission adopted New York Rule 5602.1(a)(4), which explicitly outlaws this kind of "proposition betting," or bets made regarding the occurrence or non-occurrence during a game of an event not directly affecting the game's final outcome. That regulation states that "[c]ontests shall not be based on proposition betting or contests that have the effect of mimicking proposition betting. Contests in which a contestant must choose, directly or indirectly, whether an individual athlete or a single team will surpass an identified statistical achievement, such as points scored, are prohibited."[23]

54. Underdog no longer offers its Pick'em Champions in New York State, but continues to offer its Pick'em product.

55. Plaintiffs welcome the crackdown, but it does not make them, or members of the putative class whole. They seek the value of the money they paid into Defendant's illegal gambling platforms.

## CLASS ALLEGATIONS

56. **Class Definition:** Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and a Class of similarly situated individuals, defined as

---

[22] Sam McQuillan, *PrizePicks, Underdog Fantasy Ordered To Stop "Sports Wagering" in Wyoming*, LegalSportsReport.com, https://www.legalsportsreport.com/127271/prizepicks-underdog-fantasy-ordered-to-stop-sports-wagering-in-wyoming/ (last updated July 31, 2023).
[23] *Id.*

follows:

> All persons in the United States who lost money by wagering in Pick'em style betting on mobile platforms provided by Underdog.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

57. **Numerosity:** On information and belief, thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendant's records, discovery, and other third-party sources.

58. **Commonality and Predominance:** There are many questions of law and fact common to Plaintiffs' and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a. Whether Underdog's Pick'em games are unlawful under section 1400-12 of the New York Racing, Pari-Mutuel Wagering and Breeding Law;

b. Whether Plaintiffs and each member of the Class lost money or anything of value by playing Defendant's Pick'em games;

c. Whether Defendant violated sections 5-419 and -521 of the New York General Obligation;

d. Whether Defendant violated section 349 of New York's General Business Law; and

e. Whether Defendant has been unjustly enriched as a result of its conduct.

59. **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs and the members of the Class sustained damages arising out of Defendant's wrongful conduct.

60. **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class lost money playing Defendant's games of chance. Plaintiffs also have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

61. **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiffs challenge apply and affect members of the Class uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Class are the same.

62. **Superiority:** This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

63. Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## COUNT I
## N.Y. Gen. Oblig. Law § 5-419
## Plaintiffs Against Underdog Sports, LLC d/b/a Underdog Fantasy

64. Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

65. Section 5-419 of the New York General Obligations Law states that, "[a]ny person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not."

66. Plaintiffs deposited money into accounts created and owned by Defendant for the purpose of engaging in unlawful betting and/or wagering.

67. Defendant was engaged in an unlawful enterprise wherein consumers paid to participate in unlawful betting and/or wagering.

68. Upon information and belief, Defendant operated its enterprise out of New York. Defendant processed online consumer payments in New York. Defendant's user agreements include a New York choice-of-law clause. Defendant required user communications be sent to its New York office. Defendant designated its Copyright Agent in its New York office.

69. Pursuant to § 5-419, Plaintiffs and the Class have a right to recover from Defendant the monies deposited as part of Defendant's unlawful betting and/or wagering enterprise.

**COUNT II**
**N.Y. Gen. Oblig. Law § 5-421**
**Plaintiffs Against Underdog Sports, LLC d/b/a Underdog Fantasy**

70. Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

71. Section 5-421 of the New York General Obligations Law states that, "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

72. Within the past three months, Plaintiffs deposited at least twenty-five dollars into accounts created and owned by Defendant for the purpose of engaging in unlawful betting and/or wagering.

73. Plaintiffs lost the money they deposited by engaging in Defendant's unlawful betting and/or wagering games.

**<u>COUNT III</u>**
**N.Y. Gen. Bus. Law § 349**
**Plaintiffs Against Underdog Sports, LLC d/b/a Underdog Fantasy**

74. Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

75. New York General Business Law section 349 establishes that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

76. New York General Business Law section 349 applies to Defendant because Defendant engages in consumer conduct by, *inter alia*:

a. Providing an online platform wherein consumers pay to participate in illegal wagering and betting;

b. employing individuals in furtherance of its business;

c. soliciting individuals to become consumers of its product; and

d. Obtaining consumers' money in furtherance of its business.

77. Defendant violated section 349 by, *inter alia*, misrepresenting the sports betting games they offer as consumer-to-consumer daily fantasy sports betting games instead of illegal proposition betting.

78. Defendant's conduct was material because it was likely to deceive reasonable consumers about the probability of winning their games, the lawfulness of its business and services offered, and whether they were engaged in an addictive behavior.

79. Defendant willfully misled Plaintiffs and Class members and induce them to rely on their misleading statements and/or omissions.

80. Defendant accepted money from Plaintiffs and the Class members to participate in unlawful wagering or betting.

81. Accordingly, Plaintiffs and Class members acted reasonably in relying on Defendant's misleading statements and/or omissions, the truth of which they could not have discovered through reasonable investigation.

82. Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiffs and Class members' rights.

83. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

84. Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law.

**COUNT IV**
**Unjust Enrichment**
**Plaintiffs Against Underdog Sports, LLC d/b/a Underdog Fantasy**

85. Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if fully set forth herein.

86. Plaintiffs and Class Members conferred benefit upon Defendant by paying Defendant to participate in their unlawful betting and wagering scheme.

87. Defendant appreciated or had knowledge of the benefits they received from Plaintiff and Class members.

88. Plaintiffs and Class members reasonably understood that Defendant offered lawful consumer-to-consumer fantasy sports platform services under New York state law.

89. Defendant enriched themselves by saving the costs they reasonably should have expended on complying with regulations and tax requirements for offering betting and wagering

services that were not properly advertised or permitted by law.

90. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs and Class Members' benefits conferred.

91. Plaintiffs and Class members have no adequate remedy at law.

92. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**PRAYER FOR RELIEF**

93. Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

a. Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as class counsel;

b. Declaring that Defendant's conduct, as set out above, violates sections 5-419 and -421 of the New York General Obligations Law and section 349 of the New York General Business Law;

c. Entering judgment against Defendant, in the amount of the losses suffered by Plaintiffs and each member of the Class;

d. Enjoining Defendant from continuing the challenged conduct;

e. Awarding damages to Plaintiffs and the Class members in an amount to be determined at trial, including trebling as appropriate;

f. Awarding restitution to Plaintiffs and Class members in an amount to be determined at trial, and requiring disgorgement of all benefits that Defendant unjustly received;

g. Awarding reasonable attorney's fees and expenses; Awarding pre- and

post-judgment interest, to the extent allowable;

h. Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Class; and

i. Awarding such other and further relief as equity and justice require.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: February 26, 2024 Respectfully submitted,

By: *\/s/ David S. Stellings*

David S. Stellings
Wilson M. Dunlavey
Jacob S. Miller
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
Facsimile: 212.355.9592
dstellings@lchb.com
wdunlavey@lchb.com
jmiller@lchb.com